2021 IL App (1st) 182251-U

No. 1-18-2251

Order filed October 21, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 11076 |
| | ) | |
| KAMBAI PENIX, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for reckless homicide where the evidence was sufficient to prove beyond a reasonable doubt that he acted recklessly.

¶ 2    Following a bench trial, defendant Kambai Penix was found guilty of reckless homicide while driving a motor vehicle (720 ILCS 5/9-3(a) (West 2012)) and sentenced to five years'

imprisonment. On appeal, defendant contends the evidence only established he drove with excessive speed, which is insufficient to establish recklessness. We affirm.[1]

¶ 3    Defendant was charged by indictment with two counts of aggravated driving under the influence of alcohol (DUI) and one count of reckless homicide arising from a May 20, 2012 motor vehicle accident which caused the death of Herbert Lewis. The State proceeded on one count of aggravated DUI and reckless homicide.

¶ 4    Defendant filed several pretrial motions, including motions to bar introduction of the airbag control module data and for a bill of particulars regarding the reckless homicide count. The trial court denied the former motion over defendant's argument that the chain of custody for the airbag control module had been broken. In response to the latter motion, the State asserted that it would seek to prove the acts supporting reckless homicide—specifically, that defendant failed to drive in his lane and sped at 94 miles per hour.

¶ 5    At trial, Kierra Woods testified that she was driving southbound on I-94 shortly before 6:50 a.m. on May 20, 2012. She was driving in the middle of the three lanes at 60 to 65 miles per hour, with a silver vehicle ahead and to the right. Woods looked in her rearview mirror and noticed an orange or red Camaro traveling "really fast" directly behind her. She believed the Camaro would hit her, but it switched to the right lane and attempted to pass the silver vehicle on the shoulder. Woods was "100 percent sure" the Camaro moved to the shoulder and had "nowhere else to go." Through her passenger side mirror, Woods observed the Camaro brake and hit the rear of the silver vehicle. The silver vehicle then moved from the far right to the far left lane and "bounce[d]" off a

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

wall, although Woods never saw the vehicle tumble or flip. Woods moved to keep the silver vehicle from hitting her automobile and then stopped on the right shoulder to compose herself. The Camaro "kept going," and she next saw it "stalled" on I-94. In court, Woods identified defendant as the only occupant of the Camaro.

¶ 6    Woods reported the accident to the police as she continued driving. The State published a recording of the call, which is included in the record on appeal. In the recording, Woods informed the police that a red Camaro moved around her and hit the back of another vehicle, which lost control and "flipped over and like exploded." Later that day, she viewed a lineup, identified defendant, whom she said, "had hair at the time," and signed a handwritten statement.

¶ 7    On cross-examination, Woods stated she was close to the silver vehicle when the accident happened. The right shoulder was grass and rocks, but the left shoulder had a cement wall. After the accident, the Camaro drove onto the right shoulder and continued traveling. Woods did not believe the Camaro swerved to avoid the silver vehicle, as the Camaro had already struck the silver vehicle when the Camaro moved to the right shoulder. Woods noted the Camaro's "front right side" hit the silver vehicle on the "left side" because the Camaro was trying to go around the silver vehicle to the far right. In her statement to police, Woods did not assert that she believed the Camaro would hit her.

¶ 8    On redirect examination, Woods identified photographs of the silver vehicle and Camaro as they appeared at the scene after the accident. The photographs, included in the record on appeal, depicted the damage from several angles. The Camaro is parked on the shoulder with damage to its front left side. The silver vehicle is parked next to a median concrete wall at an angle and has damage to its rear left wheel well, hood, grill, and bumper.

¶ 9    Arthur Mendez testified that he was driving a tow truck on I-94 with two passengers shortly before 6:50 a.m. on May 20, 2012, traveling at 60 to 65 miles per hour in the right-hand lane. Shortly before the Dolton Avenue exit, Mendez noticed a silver vehicle in the same lane. After Mendez switched lanes to pass the silver vehicle, one of his passengers said, "this guy is coming in fast." Mendez looked in a passenger mirror and observed a fast-moving red Camaro hit the silver vehicle and heard a loud bang.

¶ 10   According to Mendez, the Camaro tried to pass the silver vehicle on the right-hand shoulder but "didn't make it" and clipped the silver vehicle. Afterwards, the silver vehicle spun for two revolutions before hitting the wall. The Camaro continued straight on the shoulder with a "messed up" tire, stopping approximately three football fields away, right before the Sibley Boulevard exit. Mendez dropped off his passengers, then returned to the scene and informed a state trooper that he had seen the accident.

¶ 11   On cross-examination, Mendez stated that the accident occurred at sunrise, when traffic was "[v]ery light." Mendez drove at approximately 10 miles over the speed limit, and the silver vehicle had been traveling at the speed limit or a little slower when Mendez passed it. The accident happened in a "split second," but the entire event was longer. Mendez described the swerving action of the Camaro as attempting to pass the silver vehicle but acknowledged that it "could have been" an evasive maneuver to avoid hitting it. Mendez did not call the police when the accident occurred, and he returned to the scene from the opposite direction.

¶ 12   Thursten Bell testified that on May 20, 2012, he and his friend, Brian Swoop, were passengers in the tow truck. The tow truck was in the middle lane and passed a silver vehicle in the right lane. Swoop said a vehicle was "coming in hot," so Bell looked in the passenger side rear-

view mirror and noticed a red Camaro approaching "real fast" behind them, faster than the other cars on I-94. The Camaro tried to pass the silver vehicle on the right shoulder but struck its passenger side. Bell saw smoke and heard a bang. After the collision, the Camaro followed the tow truck at a high rate of speed, but never caught up to it. Bell eventually went to the police station and provided a statement.

¶ 13    On cross-examination, Bell stated that at the time of the accident, the sun was out, the weather was "pretty nice," and traffic was light. Bell observed the accident solely through the mirror and did not see the Camaro "swerve" to the right in an evasive maneuver; rather, the Camaro tapped the back of the silver vehicle and it spun out of control. The Camaro struck the "left side middle" of the silver vehicle, and one of the two vehicles hit the median.

¶ 14    Illinois State Police (ISP) special agent Starlena Wilson testified that she identified defendant as the suspect. At 3:48 p.m. on May 20, 2012, Wilson Mirandized defendant at the Calumet City Police Department, and he signed a written waiver which she identified in court.[2]

¶ 15    Defendant told Wilson he consumed two beers and a shot of cognac between 8 and 10 p.m. the night before. He also consumed two beers and a shot of cognac between 12 and 1 a.m. at a lounge. Afterwards, he drove to his girlfriend's house, and they then drove to a restaurant together in his Camaro. They left the restaurant at approximately 3 a.m. and returned to her house so that he could nap.

¶ 16    Defendant slept until he remembered he promised his mother that he would take her to church, and left the house between 6 and 7 a.m. He traveled southbound on I-94, in the middle

---

[2] Special Agent Wilson testified that defendant's interview was videorecorded, but the recording was not published at trial.

lane, when "a white cream unknown vehicle" merged into his lane. As a result, he took "evasive action" into the right-hand lane and struck Lewis's vehicle. Defendant's left bumper hit the right wheel well of Lewis's vehicle between 60 and 80 miles per hour. Defendant pulled to the right shoulder approximately a quarter of a mile south of the accident. He did not call the police.

¶ 17     On cross-examination, Wilson identified a photograph of defendant taken after his arrest and noted he "appears to be balding." The photograph is included in the record on appeal and depicts a balding man.

¶ 18     ISP trooper Theodore Pappas testified as an expert in accident reconstruction and airbag control module analysis. In 2013, he inspected the Camaro at the tow yard, performed a preliminary analysis on its airbag control module, and also examined the silver vehicle. He did not recall why he did not conduct a complete airbag control module analysis at that time.

¶ 19     In April 2018, Pappas inspected the Camaro again. He confirmed that the VIN number for the vehicle was the same from the 2013 analysis and observed damage consistent with photographs of the Camaro taken at the time of the accident. He also performed an airbag control module analysis using the 2013 data, which determined the speed of the Camaro on May 20, 2012. His results showed that "just before the airbag [felt] the change of velocity from the crash," the Camaro was "traveling between 80 and 97 miles per hour." He also discovered that 2½ seconds prior to the impact, the Camaro had been traveling between 94 and 101 miles per hour. The airbag control module device could not be changed or altered.

¶ 20     Pappas identified photographs of the two vehicles from the day of the accident. He explained that the damage to the front wheel well of the Camaro was not consistent with "being

cut off" by the silver vehicle as the Camaro had been slowed from an impact to the front. The damage to the silver vehicle was consistent with being pushed from behind, rather than sideswiped.

¶ 21   On cross-examination, Pappas stated that he was aware the Camaro had left ISP custody before he imaged the airbag control module in 2013. He analyzed the airbag control module after ISP resumed possession of the Camaro. Pappas wrote a report indicating that the fact the Camaro had been out of police custody would not be a problem for his data analysis.

¶ 22   Pappas's report did not address the fact that there were 33 ignition cycles from the time of the crash to the time he analyzed the airbag control module. Pappas was never at the scene of the accident and did not analyze anything relating to the silver vehicle, which did not flip or explode. Pappas disagreed that the collision was a "partial impact"; rather, it was a "sideswipe impact" and the damage was consistent with the Camaro steering to the right.

¶ 23   The State entered stipulations that the entirety of troopers Daniel Ralphson's and Timothy Moore's testimonies from prior hearings on defendant's motion to suppress evidence would be entered into evidence. The transcripts are included in the record on appeal.

¶ 24   Ralphson testified that he was dispatched to the scene and approached defendant in the Camaro. Defendant had "bloodshot, glassy eyes," his breath smelled strongly of alcohol, and his speech was slurred. Ralphson administered standard field-sobriety tests. Defendant passed the tests, but Ralphson ultimately arrested him.

¶ 25   Moore testified that he arrived on the scene of the crash and saw defendant standing near the Camaro. Defendant stated that he hit another vehicle which was at a standstill, but then said the vehicle was moving with the flow of traffic. Moore observed signs of intoxication.

¶ 26    The State entered the medical examiner's report and a certified copy of registration for defendant's vehicle, which are included in the record on appeal. The medical examiner's report shows Lewis died from multiple injuries due to an accidental motor vehicle collision. The certified copy of registration shows defendant owned a 2010 Chevrolet Camaro.

¶ 27    The court granted defendant's motion for a directed verdict regarding the driving under the influence charge.

¶ 28    The parties stipulated that trooper Alexander Diaz is an expert in accident reconstruction, and the accident occurred 100 feet from the Dolton Avenue exit on I-94.

¶ 29    Diaz then testified that he responded to the accident and observed a silver vehicle in the left lane of traffic, facing southwest, and a red Camaro approximately a quarter mile away on the right shoulder. The right-hand shoulder becomes narrower near the exit because the white fog line on the right side of the road increases in size, and the right shoulder has a cement wall where the accident occurred. Diaz created a reconstruction and determined that just prior to the accident, the Camaro was in the right-hand lane and veered onto the right shoulder "in what appeared to be an evasive maneuver." The report did not state the Camaro was driving on the shoulder prior to impact or hit the cement wall.

¶ 30    The impact between the Camaro and silver vehicle was a "direct impact," but not directly to the back of the silver vehicle. Diaz stated the Camaro performed an "evasive maneuver" based on his observations at the scene, his calculations, and the physical evidence he reviewed. The silver vehicle did not flip or explode. Diaz did not analyze the speed of either vehicle but received the data from Pappas.

¶ 31 On cross-examination, Diaz identified photographs of the scene, and stated that the physical damage to both vehicles was inconsistent with the silver vehicle merging into the Camaro's Lane but, rather, showed the silver vehicle was traveling straight ahead at the moment of impact.

¶ 32 In closing, defense counsel argued defendant was traveling down a highway, with good weather conditions and daylight, and braked right before impact in an evasive maneuver to avoid hitting Lewis's vehicle. According to counsel, no evidence showed that defendant drove erratically or acted with recklessness rather than neglect. Rather, the only evidence which supported recklessness was the Camaro's speed, which was not enough to support a reckless homicide conviction.

¶ 33 The court found defendant guilty of reckless homicide. In so holding, the court noted evidence that defendant was "out all night" drinking with his girlfriend and "was fatigued" when he hurried down the highway to take his mother to church. Defendant was "hurdling [hurtling] southbound at a very, very high rate of speed" due to his own decisions, and the damage to his vehicle and Lewis's vehicle comported with defendant attempting to intentionally pass it. Defendant's driving was "very, very aggressive," and "very careless," and he was not only speeding, but tailgating and driving on the shoulder. Although some evidence suggested that defendant touched the brakes, "he didn't touch them hard enough" and the notion that his actions were evasive was "laughable" and "absurd." The court found the testimony of the eyewitnesses "very" credible and consistent. Moreover, defendant expressed consciousness of guilt in his statement to Wilson wherein he invented the scenario that a vehicle swerved into his lane which

made him change lanes and strike Lewis's vehicle. The court concluded by finding defendant's driving to be "absolutely outrageous," "careless," and "reckless."

¶ 34    Defendant filed a motion and amended motion for a new trial, arguing in relevant part that the court erred in denying his motion to bar the airbag control module data, the State failed to meet its burden for reckless homicide, and the court erred in disregarding Diaz's testimony that defendant conducted an "evasive maneuver." The court denied the motions, noting that it did not know how to interpret Diaz's use of the phrase "evasive action" because it was unsure if the phrase was a term of art, but emphasized that Diaz did not speak with any eyewitnesses. The court also noted the ISP investigation "was botched from its inception." Following a hearing, the court sentenced defendant to five years' imprisonment and denied his motion to reconsider sentence.

¶ 35    On appeal, defendant argues the State failed to prove reckless homicide beyond a reasonable doubt where the eyewitness testimony was flawed, the Camaro's chain of custody had been broken, and the evidence only established defendant had been speeding. Defendant also argues the court erred in disregarding Diaz's testimony and relied on findings unsupported in the record.

¶ 36    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). This standard applies whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007) (citing *People v. Cooper*, 194 Ill. 2d 419, 431 (2000)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic

facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009)).

¶ 37 To sustain defendant's conviction for reckless homicide, the State had to prove beyond a reasonable doubt that he unintentionally killed Lewis without lawful justification while driving an automobile, the acts which caused Lewis's death were likely to cause death or great bodily harm to him, and defendant performed such acts recklessly. 720 ILCS 5/9-3(a) (West 2012). A person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2012).

¶ 38 Here, the State presented evidence that defendant had been driving substantially over the speed limit on I-94, going between 80 and 101 miles an hour. He swerved from the middle lane into the right-hand lane behind Lewis and attempted to pass Lewis's vehicle on the shoulder. In so doing, defendant struck the rear wheel well of Lewis's vehicle, causing the vehicle to travel out of control to the left side of I-94. Lewis died due to the accident. Defendant presented evidence that he was attempting to make an "evasive maneuver" around Lewis due to another vehicle merging into his lane and maintained he had not been acting recklessly.

¶ 39 Viewing the evidence in a light most favorable to the State, a rational trier of fact could find the State proved defendant committed reckless homicide. Recklessness may be inferred from

all the facts and circumstances in the record, including evidence regarding the defendant's physical condition. *People v. Edmundson*, 247 Ill. App. 3d 738, 741-42 (1993). Wilson testified that defendant stated that he consumed six alcoholic drinks and had been awake until after 3 a.m. the night before, napped for approximately three hours before remembering he needed to take his mother to church, and then began driving at 6 or 7 a.m. Accordingly, the court's determination that defendant acted recklessly where he had been fatigued, was driving excessively fast, and attempting to pass Lewis's vehicle was not so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Jackson*, 232 Ill. 2d at 281. Therefore, we must defer to the court's ruling where the evidence was sufficient to support it.

¶ 40　　Defendant nevertheless argues the State merely proved he had been speeding, which alone is insufficient for a reckless homicide conviction. See *People v. Jakupcak*, 275 Ill. App. 3d 830, 838 (1995). To that point, defendant argues that none of the State's eyewitnesses were credible due to inconsistencies in their testimony and poor vantage of the accident, and the trial court made several errors in assessing the evidence.

¶ 41　　First, defendant argues Woods's eyewitness testimony was not credible due to multiple inconsistencies in her testimony, including her description of defendant as having hair when she identified him in a lineup, which contradicts Wilson's testimony and defendant's arrest photograph, both of which show he was balding. Defendant further notes Woods stated in her initial 911 call that the silver vehicle "flipped over" and "exploded" when it did neither, and she did not inform the police that she believed the Camaro would hit her on I-94. Defendant also points to her testimony that the "front right" side of the Camaro collided with the "left side" of Lewis's

vehicle because the Camaro was attempting to pass Lewis's vehicle on the right, which was inconsistent with the damage to the vehicles.

¶ 42    Nevertheless, minor inconsistencies in testimony between witnesses or within one witness's testimony may affect the weight of the evidence but do not automatically create reasonable doubt of guilt. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. "[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283. The trier of fact may, accordingly, accept or reject all or part of a witness's testimony. *Id*. The court heard Woods's testimony, including her inconsistencies describing defendant and the collision, and found her to be "very" credible. We find no substantial discrepancies in her testimony that warrant reversal on this basis. See *id*. at 284 (noting the record contained no evidence showing that the only reasonable inference was that the discrepancies made the entirety of the testimony unworthy of belief).

¶ 43    To this same point, defendant argues Mendez and Bell were not credible where they were not in a position to accurately view the circumstances of the collision because they observed the accident through their side mirrors and varied in their descriptions of the accident. Again, we find no reason to disturb the court's credibility findings regarding these witnesses where the trier of fact was best positioned to judge their accounts. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 44    Additionally, defendant argues the court erred in disregarding Diaz's testimony that defendant made an evasive maneuver before the accident. However, the court did not disregard Diaz's comment but, rather, placed the comment in context when noting Diaz did not speak with any witnesses who observed the accident. The eyewitnesses consistently testified that defendant

attempted to pass Lewis's vehicle on the right shoulder, and none corroborated that another vehicle merged into defendant's lane requiring him to make an evasive maneuver.

¶ 45 Ultimately, defendant's contentions are a request for this court to reweigh the evidence, resolve conflicts in the testimony, and determine the credibility of witnesses. We will not substitute our judgment for that of the trial court on these issues. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 46 Defendant further contends the court erred where it based its guilty finding on defendant being fatigued and tailgating, grounds not asserted by the State in its response to the defense's request for a bill of particulars. He also contends there was no evidence he was tailgating or fatigued.

¶ 47 The function of a bill of particulars is to inform the defendant more fully of the charge against him or to enable him to better prepare his defense. *People v. Morrison*, 178 Ill. App. 3d 76, 93-94 (1988). It also serves to limit the evidence introduced by the prosecution. *People v. Kliner*, 185 Ill. 2d 81, 137-38 (1998). However, the State is not required to disclose in the bill of particulars all of the evidence it will offer in support of the charge. *Id.* at 138. Rather, "a bill of particulars limits the evidence only as to the matters that it purports to particularize and does not limit the introduction of evidence tending to prove such matter." *Id.* Any evidence tending to establish the transactions set forth in the bill of particulars is admissible. *Id.* The "variance between the bill of particulars and the evidence is fatal where the inconsistency is so substantial that it misleads the defendant in the preparation of his defense." *People v. Long*, 65 Ill. App. 3d 21, 23 (1978). Unless the defendant has been misled or prejudiced in the preparation of his defense, a variance between the bill of particulars and the trial evidence is harmless. *Kliner*, 185 Ill. 2d at 138.

¶ 48    Here, although the bill of particulars alleged that defendant committed reckless homicide by failing to drive in his lane and speeding at 94 miles per hour, we find no error in the court's consideration of defendant's fatigue and tailgating. First, the State presented evidence supporting the allegations in the bill of particulars, and the court ultimately found that defendant drove on the shoulder at a "very high rate of speed." Second, the State was not required to disclose in the bill of particulars all evidence supporting the charge of reckless homicide. See *id*. Accordingly, at trial, the State permissibly presented evidence of recklessness beyond the allegations in the bill that he had been speeding and failed to maintain his lane. The court reasonably inferred that defendant had been fatigued where he had been out with his girlfriend until 3 a.m. and woke three to four hours later, and that he had been tailgating where the eyewitnesses consistently testified that he sped close to the rear of their vehicles before he switched lanes in order to pass Lewis's vehicle on the shoulder. See *Cunningham*, 212 Ill. 2d at 280. (The reviewing court must allow all reasonable inferences from the record in favor of the prosecution.) The court found that these facts, together with the evidence showing defendant drove on the shoulder at a "very high rate of speed," supported the conclusion he had been acting recklessly. Moreover, defendant does not claim to have been misled or prejudiced in the preparation of his defense by the alleged variance between the bill of particulars and the evidence. Consequently, any purported error by the court in considering these factors is harmless. See *Kliner*, 185 Ill. 2d at 138.

¶ 49    Lastly, defendant argues the court should not have considered the data retrieved from the Camaro's airbag control module because the chain of custody had been broken. Defendant cites *People v. Woods*, 214 Ill. 2d 455 (2005), for the proposition that where an item is not readily identifiable or is susceptible to tampering, the State must make a *prima facie* showing that it took

protective measures from the time the item was seized, and it was unlikely the item had been tampered with in order to establish the chain of custody. However, our supreme court in *Woods* also noted that "where an item has readily identifiable and unique characteristics, and its composition is not easily subject to change, an adequate foundation is laid by testimony that the item sought to be admitted is the same item recovered and is in substantially the same condition as when it was recovered." *Woods*, 214 Ill. 2d at 466.

¶ 50    Here, Pappas testified that the VIN numbers for the Camaro were the same in the 2013 and 2018 analyses, the airbag control module device could not be changed or altered, and the release of the vehicle "was not a problem" for the data. Pappas's trial testimony directly contradicts defendant's unsupported contention that the airbag control module was susceptible to tampering. Further, Pappas's uncontradicted testimony also establishes that the airbag control module had readily identifiable characteristics. Accordingly, under *Woods*, the State laid an adequate foundation for the airbag control module device and data (see *id.*), and the court did not err in considering this evidence. Moreover, the testimony regarding the module was unnecessary as the State presented eyewitness testimony that defendant had been speeding. See *Watkins v. Schmitt*, 172 Ill. 2d 193, 206-207 (1996) (a lay witness may express an opinion concerning a vehicle's speed, and if the witness is unable to estimate miles per hour, he or she may state it as fast or slow). Considering all of the evidence together, in a light most favorable to the State, we find a rational trier of fact could have found that defendant was driving recklessly when he hit Lewis's vehicle, causing his death.

¶ 51    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 52    Affirmed.